Commonwealth *v.* Weaver, Appellant.

222

Submitted March 28, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Barbara Bailey* and *John W. Packel,* Assistant Defenders, and *Vincent J. Ziccardi,* Defender, for appellant.

*David Richman, William P. Boland, Mark Sendrow,* and *Steven H. Goldblatt,* Assistant District Attorneys, *Abraham J. Gafni,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellee.

OPINION BY VAN DER VOORT, J., December 11, 1974:
The Defendant-Appellant Lawrence Weaver was tried and adjudged guilty on December 8, 1972 of ag-

gravated robbery by Judge Herbert SALUS, JR., sitting without a jury. Post-trial motions were filed, heard and denied on February 13, 1973 after which determination, the Appellant was sentenced to not less than six months nor more than three years in the State Correctional Institution. This direct appeal was taken following the sentence.

On May 2, 1972, at about 9:10 P.M., John Scannapieco was standing in a subway station at 34th and Market Streets on the platform waiting for a train. He was alone. The Appellant came over to Mr. Scannapieco and asked him for a cigarette. After receiving a negative reply, the Appellant asked Mr. Scannapieco if he was interested in a "38", at which time the Appellant showed Mr. Scannapieco his pocket which had the outline of a gun in it and the Appellant had his hand in the pocket where the gun was. After receiving another negative reply, the Appellant said to Mr. Scannapieco, "Don't make any jokes, I want your money." The victim then replied that he did not have any money. About that time another person came up behind the victim and the Appellant spoke again saying: "He is with me. Give me your money, we will blow a hole in your head." The victim told the two men he still had no money whereupon the man who had come up behind the victim took the victim's wallet out of his pocket and took the money ($18.00) out of it. The victim was then commanded by the Appellant not to say a word or he would be shot and to get on the next train which came in about five or six minutes. During that time the victim conversed with his assailants. They told him they needed the money for dope. The victim suggested they go to a hospital and get treatment to solve their problem. He was told by them that that wouldn't work and Appellant said, "Well, maybe we ought to shoot you. We can have some fun." All in all, the victim and his assailants were together for eight or

nine minutes in a well-lighted place at which time Appellant was never more than thirty inches from Mr. Scannapieco.

The victim boarded the next train, informed the conductor what had happened and reported the matter to the police whom the conductor had asked to be at the next stop.

On August 22, 1972, Mr. Scannapieco received a call from the Philadelphia Detective Division that it had a couple of suspects in custody and would like him to view a line-up at West Detective Offices. Mr. Scannapieco was at work at the time and said he would come down. The Appellant had been arrested at 9:15 P.M. on another charge and brought into West Detective Offices on August 21, 1972. He was in charge of Detective Brennan. The Appellant was fed a ham sandwich, coffee, soup and cake and was placed in an 18th District cell block. Detective Brennan left a note for Detective Salvatore Gerace that Appellant had been arrested under conditions similar to the Scannapieco robbery and that a stand-up should be had with him. Detective Gerace received this message on August 22nd at 11:00 A.M. At 1:45 P.M., Appellant was fed again in a manner similar to his previous meal and held in the Detective's Room. At 3:00 P.M., Detective Gerace contacted Mr. Scannapieco about coming down to West Detective Offices; he contacted the Public Defender and Attorney Steven Laver was informed that a stand-up would be held around 6:00 o'clock and that transportation to West Detective Offices would be provided for him if he wanted it. Mr. Laver came over and conferred with the Appellant. He questioned Mr. Scannapieco; he objected to the proposed line-up which was comprised of six men, all of whom were black (the two suspects were black). To meet some of Mr. Laver's objections, the line-up was arranged so that all six participants were stripped

to the waist and seated at a table so that only that part of their body which appeared above the waist was visible. At 6:20 P.M., Mr. Scannapieco was afforded a view of the line-up through a one-way (sometimes referred to as a two-way) glass. All of Mr. Laver's objections which could be met were met by Detective Gerace. The victim identified positively both of the robbers who took his money from him in the subway station on May 2nd.

The Appellant claims that under the ruling of *Commonwealth v. Futch,* 447 Pa. 389, 290 A. 2d 417 (1972), the evidence of identification at the line-up should not have been admitted and that there was not sufficient evidence in the record to determine whether or not the in-court identification of the Appellant had an independent source or that such evidence was tainted by the alleged unlawful pre-trial identification. *Commonwealth v. Futch,* supra, dealt with the question of unnecessary delay between arrest and arraignment. It involved the interpretation of the procedural provisions of Rule 118 (at that time) of Pa. R. Crim. P., Rule 118 is now renumbered Rule 130;[1] it provides as follows:

"*RULE 130* Procedure in Court Cases Initiated By Arrest Without Warrant.

When a defendant has been arrested without a warrant in a court case, he shall be taken without unnecessary delay before the proper issuing authority where a complaint shall be filed against him and he shall be given an immediate preliminary arraignment."

In *Futch,* the Defendant was subjected to an uncounseled line-up thirteen hours after his arrest; he

---

1. For all practical problems involved in the instant case, these Rules are the same even though there is a slight difference in the wording of the renumbered Rule.

was arraigned one hour later. The Court held that this fourteen-hour interim constituted unnecessary delay between arrest and arraignment, that it was a primary factor in the Defendant's being subjected to an uncounseled line-up, that this resulted in prejudice to the Defendant and that the identification evidence must therefore be excluded. Further, in *Futch,* the Court said at 394, "Had there not been 'unnecessary delay' the defendant would have had a preliminary arraignment pursuant to Rule 19 [now Rule 140] at which an officer of the court would have informed defendant of his right of counsel and delivered a copy of the complaint to him."[2] The Court further said at 395: "Had the mandate of Rule 118 [now Rule 130] been complied with an officer of the court would have informed defendant before the lineup of his right to counsel at the lineup, and thus a constitutionally valid procedure would have been assured." In the instant case the Appellant was provided with counsel who, as he should do, took diligent action to protect his client during the line-up procedure.

*Commonwealth v. Futch,* supra, was followed by *Commonwealth v. Tingle,* 451 Pa. 241, 301 A.2d 701 (1973), in which the Court held that a non-counseled confession secured in twenty-one and one-half hours after arrest and before arraignment could not be used as evidence against the Defendant notwithstanding the fact that during this interim period the Defendant had been given his Miranda warnings. In *Tingle,* the Court referred to the purpose of Rule 118 [now Rule 130] and the interpretation given in *Commonwealth v. Futch,* 447 Pa. 389, and declared the purpose to be "to insure that 'without unnecessary delay' after arrest, an ac-

---

[2] Whether or not the Defendant in the instant case had a copy of the complaint would have had no bearing one way or another on the identification line-up.

cused is informed by an officer of the court of his right to counsel." 451 Pa. at 246.

*Tingle* is not apposite to the case at bar for the reason that Appellant was not only advised of his right to counsel but was actually provided with counsel before and during the line-up. More apposite is *Commonwealth v. Corbett*, 228 Pa. Superior Ct. 292, 297, 323 A.2d 836, 838 (1974), where we said through Judge JACOBS in comparable circumstances "had the appellant in this case been taken before a magistrate prior to the lineup, he would have found himself in no better position."

Following *Commonwealth v. Tingle* was *Commonwealth v. Hancock*, 455 Pa. 583, 317 A.2d 588 (1974), in which the Court ruled that an uncounseled identification procured nineteen hours after arrest was the result of unnecessary delay and evidence of such identification could not be used at trial. In *Hancock*, the Defendant had waived counsel at the identification procedure, a constitutional right and hence there was a nexus between the delay and the waiver of his unconstitutional right resulting in prejudice to the Defendant. In *Hancock*, the Court said, 455 Pa. at page 587: "While we do not require that the investigatory process cease at the time of a warrantless arrest we do require compliance with Rule 118 [now Rule 130] prior to any investigative procedure conducted for the purpose of gathering further evidence against the accused if that procedure is dependent upon the waiving of a constitutional right." In the instant case the Appellant waived no right to counsel, no right to remain silent nor any constitutional right at all. Furthermore, the Defendant-Appellant was arrested upon a charge other than the one of which he now complains. He was being held for arraignment on this other charge. Any delay in the arraignment of appellant insofar as the charge about which he now complains is concerned was neces-

sary to permit further investigation of such charge. Mr. Scannapieco had a constitutional right to have a look at or to see the appellant at the earliest possible time after his arrest on the other charge. The public had a right to have Mr. Scannapieco view appellant as promptly as possible. These are constitutional rights arising under Article 1, Sections 1 and 2 of the Constitution of Pennsylvania, which provide as follows:

"*Section 1.*   Inherent rights of mankind

All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

*Section 2.*   Political powers

All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness."

Our Constitution gives just as much right to Mr. Scannapieco as it does to the appellant to defend his liberty and to protect his property.  So far as Mr. Scannapieco was concerned appellant had deprived him of his liberty and had stolen his property.  Mr. Scannapieco had a right to defend his liberty against his assailant and to protect his property without having to resort to weapons but to do so in a lawful manner as provided him by the Philadelphia detectives and police. Our Constitution also gives to the people of Pennsylvania the right to maintain their peace, safety and happiness.  They should be able to insure their safety without resorting to weapons but in a lawful manner such as having the victim view his assailant as soon as possible.  When the right of the victim to get a look at his assailant in a case such as this and the right of the public to have him do so are weighed against the right of the appellant to a prompt arraign-

ment there is certainly no valid reason why the appellant should not be held as a matter of reasonable necessity for twenty-one and one-half hours to give the victim an opportunity to view the suspect in a counseled line-up. With the arrest taking place at 9:15 at night a counseled line-up could not very well be done more quickly than the following day at 6:20 P.M. Were the victim and the public to await the arraignment of suspects in the position of the appellant, the appellant would be released on bail and although legally he would be bound to appear after notice to do so for a line-up at a subsequent date there is no certainty that he would ever so appear and the suspect by not appearing promptly for the line-up could create delay while the memory of the victim dims.

Even if more weight should be given in to the right of the appellant than to the rights of the victim and the people and the holding of the appellant be declared unnecessary delay, the appellant has not shown any prejudice. He had counsel who conferred with him before the line-up was established, he questioned the victim and he made with respect to the line-up certain demands of which all were complied with, with the exception of the fact that one of the participants in the line-up had a lighter skin pigment than the other five, one participant was heavier than the other five, and a comb could not be found with which the appellant could comb his unruly hair. These items were minor and were not prejudicial to a proper and fair line-up identification. The appellant argues that there was not sufficient evidence to determine whether or not the victim had a source of knowledge of the appearance of his assailant independent of the line-up upon which to base the in-court identification of appellant. The area in which the robbery took place was lighted "on the order of brightness of the court room" where the trial was taking place. The victim observed

and watched the appellant for a period of eight or nine minutes while they were not further apart than thirty inches. Immediately after the incident Mr. Scannapieco gave a description to SEPTA and again to the police. This description was detailed and there is no evidence indicating that it was not accurate. The victim at no time failed to identify the appellant nor did he ever identify anyone different from the appellant. A careful review of the testimony leads us to conclude that there was ample evidence to support the admission of the in-court identification evidence on the basis that there was an independent source to support such testimony. From the manner in which the line-up was conducted in the presence of counsel, it is clear that the line-up procedure was not suggestive and that it did not taint the subsequent in-court testimony.

Accordingly, the judgment of sentence is affirmed.

JACOBS, HOFFMAN, CERCONE, PRICE, and SPAETH, JJ., concur in the result.